Gilbert ROEDER, etc.,
Plaintiff, Appellant,

v.

ALPHA INDUSTRIES, INC., et al.,
Defendants, Appellees.

No. 86–1684.

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1987.

Decided March 23, 1987.

John D. Donovan, Jr. with whom Paul B. Galvani and William L. Patton, Boston, Mass., were on brief for defendants, appellees.

Before BOWNES, Circuit Judge, ROSENN,* Senior Circuit Judge, and SELYA, Circuit Judge.

BOWNES, Circuit Judge.

Plaintiff-appellant Gilbert Roeder brought a class action suit on his own behalf and on behalf of others similarly situated against defendants-appellants Alpha Industries, Inc., a company in which he owned stock, and its officers and directors, for damages and declaratory relief under the securities laws and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1982 & Supp. III 1985). Roeder alleged defendants were liable for not publicly disclosing until indictment was imminent that Alpha had paid a bribe to obtain subcontracts. He appeals from an order by the district court granting defendants' motion to dismiss for failure to state a claim. We affirm the district court's decision, but on somewhat different grounds.

## I. BACKGROUND

Alpha is a Massachusetts-based corporation engaged principally in high technology defense contract work. In May 1983 Alpha was bidding on subcontracts being let by Raytheon Company, a prime defense contractor for an electronic warfare countermeasures program, ALQ 119/184. Roeder alleges that Alpha, through its president, Andrew S. Kariotis, and its vice-president, Anthony J. DeCarolis, paid $57,000 to Chester Adamsky, a Raytheon employee, so that he would use his influence to obtain subcontracts for Alpha for the sale of electronic devices to be used in the ALQ 119/184 program. The bribe was allegedly falsely represented as compensation for an extensive marketing study purportedly performed for Alpha by A & H Associates, an entity owned and controlled by Adamsky,

Edward F. Haber, P.C. with whom John J. Barter, Charles W. Rankin and Rankin & Sultan, Boston, Mass., were on brief for plaintiff, appellant.

* Of the Third Circuit, sitting by designation.

and paid in three installments in 1983: $27,-000 on July 1, $25,000 on August 5, and $5,000 on October 21.

On October 3, 1984, Alpha publicly announced that one of its vice-presidents probably would be indicted as a result of a grand jury investigation. On October 23, 1984, Alpha and DeCarolis were indicted for interstate transportation of funds obtained by fraud, mail and wire fraud, and payment of kickbacks to a prime government contractor. Alpha and DeCarolis eventually pleaded guilty to one count of violating the Anti-Kickback Act, 41 U.S.C. § 51 (1982).

Roeder bought 400 shares of Alpha's common stock at slightly more than $21 per share on December 30, 1983, which was after the alleged bribe was paid but before disclosure. He sold his shares on January 29, 1985, for a little more than $11 per share. He seeks to recover the loss in stock value attributable to what he alleges was an overdue announcement of Alpha's involvement with Adamsky. He brought this suit on behalf of himself and others who bought Alpha's stock between May 23, 1983, and October 3, 1984. The first count of his two-count complaint alleges that Alpha, Kariotis, and DeCarolis violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and Securities and Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.10b–5 (1986), by not disclosing between May 24, 1983, and October 3, 1984, that they were engaging in illegal and fraudulent conduct. This was the interval between the alleged initiation of the bribe and the announcement of the impending indictment. The second count alleges that the bribe constituted a pattern of racketeering activity making defendants liable for treble damages under RICO, 18 U.S.C. § 1964(c) (1982). The district court dismissed both counts for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. SECURITIES FRAUD

Roeder claims Alpha, Kariotis, and DeCarolis violated Rule 10b–5 when they failed to disclose between May 24, 1983, and October 3, 1984, that Adamsky had been bribed. Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. A private cause of action exists for those injured by violations of this rule. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975). The district court held that the alleged bribery was not "material" information until an indictment became likely; illegal conduct that has not been discovered need not be disclosed. The court said "it appears that Alpha disclosed the probability of indictment at the time it became probable." Therefore, the court concluded, there was no failure to disclose material information.

Roeder claims the following were material facts: the bribery, the violation of criminal statutes, the breach of Alpha's contracts with Raytheon, and the exposure of the corporation to fines, legal fees, and the possible cancellation of government contracts. By not disclosing these facts before the announcement of the impending indictment, Roeder argues, defendants engaged in fraudulent and manipulative acts proscribed by Rule 10b–5.

### A. Materiality

■ We note initially that the court's assessment of the timing of Alpha's disclo-

sure—that Alpha disclosed the impending indictment as soon as it became probable—appears to resolve a factual issue in defendants' favor. In ruling on a motion to dismiss, however, a court should not decide questions of fact. A complaint is to be construed in the light most favorable to the plaintiff; dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Read in this light, Roeder's complaint does not concede that Alpha revealed it faced criminal charges as soon as they became probable.

Even if the district court were correct in concluding "that Alpha disclosed the probability of indictment at the time it became probable," we do not think it is necessarily true that information about bribery is not material until it becomes the subject of an indictment. Information is material if "a reasonable investor might have considered [it] important in the making of [the investment] decision." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972); *Cook v. Avien, Inc.*, 573 F.2d 685, 693 (1st Cir.1978). This determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). On the basis of the facts alleged in Roeder's complaint, we conclude that reasonable investors might have considered defendants' alleged illegal conduct to be important information they would want to have before they made their investment decisions.

Information about bribery is relevant to important questions about the competency of management. Management's willingness to engage in practices that probably or obviously are illegal, and its decision to put the corporation at risk by so doing, may be critically important factors to investors. *See* Ferrara, Starr & Steinberg, *Disclosure of Information Bearing on Management Integrity and Competency*, 76 Nw.U.L.Rev. 555, 555–56, 581–87 (1981). Investors may prefer to steer away from an enterprise that circumvents fair competitive bidding and opens itself to accusations of misconduct. Furthermore, regardless of financial motives, investors may not want to associate themselves with such an enterprise.

Defendants assert that they should not be required to accuse themselves "of antisocial or illegal policies." (quoting *Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co.*, 475 F.Supp. 328, 331 (S.D.N.Y.1979), *vacated as moot*, 638 F.2d 7 (2d Cir.1980)). In a sense, they are right: information does not become material simply because some may regard it as antisocial or illegal. But otherwise material information does not become any less material because someone may be indicted if it is discovered by the authorities. The securities laws do not operate under the assumption that material information need not be disclosed if management has reason to suppress it. Investors may want to know about illegal activity for the same reason management will be reluctant to reveal it: it threatens to damage the corporation severely. Excepting from the disclosure rules information management has reason to hide would eviscerate the protection for investors embodied in the securities laws.[1]

---

1. Defendants argue that there were no "facts" that could have been released before the impending indictment became probable; only "contingencies" existed before then. The legal consequences of the bribery may have been only contingencies, but the act itself would be a fact. Roeder has provided an example of a release that included factual information without speculation:

WOBURN, MA (December 29, 1983)—Alpha Industries, Inc., announced today that its President, Andrew Kariotis, and its Vice President of Sales, Anthony DeCarolis, had caused Alpha to pay an employee of the Raytheon Company $57,000, as an inducement for that Raytheon employee to cause Raytheon to award Alpha a sub-contract on certain defense work.

Defendants rely on *United States v. Matthews*, 787 F.2d 38 (2d Cir.1986), for their proposition that uncharged criminal conduct need not be disclosed as a matter of law. In *Matthews*, the court held that the securities laws were not violated by a defendant's failure to disclose in a proxy statement that he was a member of a conspiracy. *Matthews* is different from this case in several important respects. *Matthews* was an appeal from a criminal conviction under the securities laws. *Id.* at 39. This case involves a civil damages complaint; it does not raise the fifth amendment concerns that were present in *Matthews*. *See United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980) (fifth amendment protections against self-incrimination do not apply in a strictly civil context). In *Matthews*, the defendant was acquitted on charges of being involved in the conspiracy he was accused of failing to disclose. 787 F.2d at 42–43. There has been no such acquittal on the bribery accusations made in this case.

Management cannot be expected to disclose information that some may find distasteful but that does not alter "the 'total mix' of information made available" to the investor. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132. Corporate bribery, however, involves more than matters of taste. Illegal payments that are so small as to be relatively insignificant to the corporation's bottom line can still have vast economic implications. *See SEC v. Jos. Schlitz Brewing Co.*, 452 F.Supp. 824, 830 (E.D.Wis.1978) (it may be material that brewery risked losing its license to sell beer by engaging in illegal practices). Even small illegal payments can seriously endanger a corporation's business, especially when it relies heavily on government contracts, because such activity can result in the corporation being barred from obtaining future government contracts or subcontracts. *See* 48 C.F.R. §§ 9.406–2, 9.407–2 (1986). Such a bar

would be devastating to Alpha; it relied on defense-related contracts for sixty to sixty-five percent of its sales. Disclosure of the illegal conduct in obtaining government subcontracts, therefore, could have had a very significant impact on the " 'total mix' of information made available" to Alpha's investors. We hold that it could not properly be concluded on the basis of the pleadings alone that the alleged bribery did not become material until defendants learned that they would be the subject of a criminal indictment.

### B. Duty to Disclose

■ The materiality of the information claimed not to have been disclosed, however, is not enough to make out a sustainable claim of securities fraud. Even if information is material, there is no liability under Rule 10b–5 unless there was a duty to disclose it.

A duty to disclose "does not arise from the mere possession of nonpublic market information." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). One situation in which there is a duty to disclose is when a corporate insider trades on confidential information. *Id.* at 228–29, 100 S.Ct. at 1114–15. Roeder's complaint, however, does not allege insider trading. When a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860–61 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). "If ... a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth." *Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 409 (N.D.Ill.1984). Roeder's complaint does not mention any required or voluntary disclosures Alpha made that were inaccurate, incomplete, or misleading.

The Board of Directors of Alpha has appointed a committee of independent Directors to investigate this matter, to identify all officers and employees who were involved in this improper payment of Alpha's funds, and to take all necessary disciplinary steps to insure that Alpha does not engage in such conduct in the future.

Instead, Roeder claims that a corporation has an affirmative duty to disclose all material information even if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures. The prevailing view, however, is that there is no such affirmative duty of disclosure. *See, e.g., Starkman v. Marathon Oil Co.,* 772 F.2d 231, 238 (6th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Staffin v. Greenberg,* 672 F.2d 1196, 1204 (3d Cir.1982); *Grossman v. Waste Management, Inc.,* 589 F.Supp. at 409; *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1489 n. 12 (D.Del.1984); *Schlanger v. Four-Phase Sys., Inc.,* 582 F.Supp. 128, 133 (S.D.N.Y. 1984); Block, Barton & Garfield, *Affirmative Duty to Disclose Material Information Concerning Issuer's Financial Condition and Business Plans,* 40 Bus.Law. 1243, 1249–50 (1985).[2]

Roeder relies on the "fraud on the market" theory, which has been employed by a number of courts in nondisclosure cases, for his argument that there is an affirmative duty to disclose material information to the public. *See Lipton v. Documation, Inc.,* 734 F.2d 740, 743 (11th Cir.1984), *cert. denied,* 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985). Contrary to Roeder's claim, the fraud on the market theory has nothing to do with an affirmative duty to disclose material information. It only addresses the "unreasonable and irrelevant evidentiary burden" of requiring plaintiffs in nondisclosure cases to prove reliance. *Blackie v. Barrack,* 524 F.2d 891, 907 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). When plaintiffs have established a breach of duty to disclose material information, they are relieved of the burden of proving they relied on the nondisclosure in making their decisions. The market price of stock is taken to be the basis for investment decisions; because the price reflected all available information, investors are presumed to have been misled by the nondisclosure. *See Lipton v. Documation, Inc.,* 734 F.2d at 742–43; *Abelson v. Strong,* 644 F.Supp. 524, 528 (D.Mass.1986); Note, *The Fraud on the Market Theory: Efficient Markets and the Defenses to an Implied 10b–5 Action,* 70 Iowa L.Rev. 975, 978–86 (1985).

██ We need not decide whether we think these assumptions are a sound method for dealing with the problem of proving reliance in nondisclosure cases. Reliance is not at issue here. What is important for our purposes is that the fraud on the market theory does not dispense with the requirement that there must be a duty to disclose before there can be liability. *See Affiliated Ute Citizens v. United States,* 406 U.S. at 153–54, 92 S.Ct. at 1472 (the *"obligation to disclose* and [the] withholding of a material fact establish the requi-

---

**2.** In *Issen v. GSC Enters., Inc.,* 538 F.Supp. 745 (N.D.Ill.1982), the court held that all material information had to be disclosed in annual reports "notwithstanding the absence of an explicit statutory or regulatory duty to do so." *Id.* at 750. The court said "it would seem clear that reasonable investors should be able to place their trust and confidence in the annual report issued by the corporation." *Id.* at 751 n. 9. Apparently, *Issen* stands alone in imposing a duty to include all material information in annual reports. *See* Block, Barton & Garfield, 40 Bus.Law. at 1249 n. 38. There are problems with using the annual report as a catchall depository for material information not required to be disclosed elsewhere. Certainly, literal compliance with reporting requirements does not absolve an issuer from liability if a material fact has been omitted that is "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Rule 10b–5(b). The SEC, however, was "given complete discretion ... to require in corporate reports only such information as it deems necessary or appropriate in the public interest or to protect investors." S.Rep. No. 792, 73d Cong., 2d Sess. 10 (1934), *quoted in Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1051 (D.C.Cir.1979). A general admonition to include "all material information" in annual reports preempts the promulgated regulations' instructions on what information to include and, because of the threat of civil liability, it would result in all sorts of information appearing in the reports that the SEC may prefer be left out. If the SEC wanted all possibly material information to be in the annual reports, we suspect that the regulations would have been amended to require it. The utility of such a regulation would be doubtful. In any case, Roeder's complaint did not even allege that Alpha's annual reports were at all misleading.

site element of causation in fact" in the absence of positive proof of reliance (emphasis added)). In every fraud on the market case Roeder cites, there was a duty to disclose because of misleading reports or statements. *Lipton v. Documation, Inc.,* 734 F.2d at 741 (false claims of earnings and revenue in financial reports and statements); *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Auth.,* 717 F.2d 1330, 1331–32 (10th Cir.1983) (misrepresentations of validity of bonds in offering circular and bond opinion), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Panzirer v. Wolf,* 663 F.2d 365, 366 (2d Cir.1981) (misleading information in annual report about corporation's ability to function as a going concern), *vacated as moot sub nom. Price Waterhouse v. Panzirer,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Shores v. Sklar,* 647 F.2d 462, 464 (5th Cir.1981) (en banc) (misleading offering circular), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Holmes v. Bateson,* 583 F.2d 542, 546–51 (1st Cir. 1978) (misleading financial information in reports and statements), *aff'g in part, rev'g in part* 434 F.Supp. 1365 (D.R.I. 1977); *Blackie v. Barrack,* 524 F.2d at 894 (losses underrepresented in annual reports, press releases, and SEC filings).

In sum, Roeder's complaint does not allege facts that, if proved, would establish Alpha had a duty to disclose the alleged illegal payments. We affirm the dismissal of the securities fraud count because of this deficiency. *See Roy v. City of Augusta, Maine,* 712 F.2d 1517, 1520 n. 3 (1st Cir.1983) (a dismissal can be affirmed on any valid ground).

## III. RICO

The second count of Roeder's complaint alleges that the bribe paid to Adamsky constituted a pattern of racketeering activity making defendants liable under RICO. RICO provides that "[a]ny person injured in his business or property by reason of a violation" of the prohibitions on racketeering in 18 U.S.C. § 1962 may recover treble damages. 18 U.S.C. § 1964(c). Roeder's complaint alleges violations of all four of the activities prohibited in section 1962: receiving income from a pattern of racketeering activity and using it in the operation of an enterprise, § 1962(a); acquiring and maintaining control over an enterprise through a pattern of racketeering activity, § 1962(b); conducting or participating in a pattern of racketeering activity in the conduct of an enterprise's affairs, § 1962(c); and, conspiring to violate these prohibitions on racketeering activity, § 1962(d). The district court held that Roeder's characterization of his RICO claim under section 1962(c) failed to identify distinct persons and enterprises, which is required to sustain a claim under that section. The court also held that Roeder's injuries were not compensable because they were not suffered "by reason of" Alpha's alleged racketeering activities. A third issue, raised by defendants on appeal as an alternative ground for affirmance, is whether the alleged bribery constitutes a "pattern of racketeering activity" prohibited under RICO.

### A. Section 1962(c) "Persons" and "Enterprises"

Roeder alleged that the bribing of Adamsky violated, among other things, section 1962(c) of RICO, which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The district court held that Roeder's claim under this section had to be dismissed because of ambiguity about who the "persons" and "enterprises" were in the alleged racketeering scenario. Roeder alleged in his complaint that Alpha, Kariotis, and DeCarolis are "persons," and that these three, plus Raytheon, Adamsky, and an entity owned and controlled by Adamsky, A & H Associates, "individually, collectively and in any combination among

them, is an 'enterprise.' " To state a claim under section 1962(c), the "person" alleged to be engaged in a pattern of racketeering activity must be distinct from the "enterprise." *Schofield v. First Commodity Corp. of Boston,* 793 F.2d 28, 29 (1st Cir. 1986). One corporation—in this case, Alpha—"may not serve in two roles at the same time." *Id.* at 30. If Alpha is a "person," it cannot also be the "enterprise."

The district court noted that a claim against Kariotis and DeCarolis would be stated if only they, and not Alpha, are considered to be "persons," and Alpha is considered to be the "enterprise." Roeder's characterization of the entities, phrased in the alternative, could possibly be construed as alleging this scenario. Furthermore, the complaint listed Raytheon, Adamsky, and A & H Associates as enterprises as well. Therefore, Roeder's designation of the entities for the purpose of his section 1962(c) claim requires dismissal of that claim only if his complaint is read inflexibly. Such an approach is inappropriate under the Federal Rules of Civil Procedure. *See Conley v. Gibson,* 355 U.S. at 47–48, 78 S.Ct. at 102–103.

### B. The Causation Requirement

■ Section 1964(c) of RICO provides a cause of action for those injured in business or property "by reason of" prohibited racketeering activities. The district court concluded as a matter of law that Roeder could not have been injured "by reason of" defendants' alleged racketeering. The court said the illegal payments to Adamsky were meant to benefit shareholders, and that "[i]t was the unintended mischance of getting caught which produced a disaster in which the plaintiff unfortunately shared along with the defendants."

Roeder claims that he was injured when defendants engaged in racketeering activity of which investors were unaware, causing the price of Alpha's stock to be inflated. Therefore, he urges, those who bought the stock after the alleged bribery, but before disclosure, paid a higher price than the stock was worth, and suffered a loss

when the price dropped after information about the bribery was released to the market. We agree with the district court that an inflated market price of Alpha's stock would not be "by reason of" the bribery. If the price of Alpha's stock was higher than it should have been when Roeder bought it, this was "by reason of" nondisclosure.

Roeder's complaint, however, also can be read as alleging that the stock price was inflated by securities fraud. Under RICO, "racketeering activity" includes "any offense involving ... fraud in the sale of securities ... punishable under any law of the United States." 18 U.S.C. § 1961(1). Therefore, even though the stock price cannot fairly be said to have been inflated "by reason of" the bribery, if it was inflated "by reason of" nondisclosure that violated the securities laws, the requisite causal connection for RICO could exist. But this nexus vanished when we concluded that Roeder's complaint did not allege facts that, if proved, would establish that the nondisclosure violated the securities laws.

There is another way in which Roeder claims he was injured. His complaint alleges that the bribery caused the market price of Alpha's stock "to be worth less and to decline." As the district court pointed out, the alleged racketeering activity was not aimed at Alpha's shareholders; the direct victims of the scheme would be those who stood to lose if Alpha obtained the subcontract by improper and illegal means. Recovery under RICO, however, is not limited to direct victims. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). Damages that "flow from the commission of the predicate acts" are recoverable. *Id.* A corporation's involvement in illegal activity can result in a loss of business and damage to its ability to compete, and these negative effects would be reflected in the value of the corporation's stock.

■ A suit under RICO for injuries to the corporation, however, can only be brought by the corporation itself or by a shareholder suing derivatively on behalf of the corporation. *Rand v. Anaconda-Erics-*

*son, Inc.,* 794 F.2d 843, 849 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *Warren v. Manufacturers Nat'l Bank of Detroit,* 759 F.2d 542, 545 (6th Cir.1985). Any decline in market price of the shares owned by Roeder and the class he seeks to represent— those who bought Alpha stock between May 23, 1983, and October 3, 1984—that can be said to have flowed from defendants' actions "merely reflects the decrease in value of the firm as a result of the alleged illegal conduct." *Rand v. Anaconda-Ericsson, Inc.,* 794 F.2d at 849. "It is only where the injury sustained to one's stock is peculiar to him alone, and does not fall alike upon other stockholders, that one can recover as an individual." 12B W. Fletcher, *Cyclopedia of the Law of Corporations,* § 5913, at 434 (rev. perm. ed. 1984); *see also Carter v. Berger,* 777 F.2d 1173, 1175 (7th Cir.1985) ("The investors in the firm suffer when the firm incurs a loss, yet only the firm may vindicate the rights at issue."); *Small v. Goldman,* 637 F.Supp. 1030, 1031 (D.N.J.1986) (finding the courts to be unanimous in not allowing shareholders to bring actions in their own right for injuries to the corporation absent "some specific direct harm" to the shareholders). A RICO action to recover for injury to the corporation "is a corporate asset, and shareholders cannot bring it in their own names without impairing the rights of prior claimants to such assets." *Rand v. Anaconda-Ericsson, Inc.,* 794 F.2d at 849. Roeder's RICO complaint is not the proper vehicle for shareholders to obtain redress for any damage defendants' activities inflicted on Alpha.

In sum, Roeder may not maintain an action under RICO in his own right, or on behalf of the limited class of shareholders he seeks to represent, for injury to the corporation and the consequent decline in stock price affecting shareholders generally. Particular shareholders' losses suffered "by reason of" nondisclosure constituting a violation of the securities laws would be recoverable but, as already pointed out, Roeder's complaint does not allege facts that would establish Alpha violated the securities laws by not disclosing the alleged bribery before they did.

### C. The Pattern Requirement

■ Even if Roeder's losses were in some way suffered "by reason of" defendants' alleged bribery, his RICO claim fails for another reason. It is not enough that defendants may have engaged in racketeering "acts"; these acts must constitute a "pattern of racketeering activity" as construed under RICO for there to be liability. *See* 18 U.S.C. § 1962. The alleged bribery of Adamsky, even though it may have involved a number of acts separately chargeable under the criminal law, was not the sort of "pattern of racketeering activity" contemplated under the statute.

"Racketeering activity" under RICO includes acts of bribery, mail fraud, wire fraud, and interstate transportation of money taken by fraud, crimes alleged to have been committed by defendants. RICO provides that a " 'pattern of racketeering activity' requires *at least* two acts of racketering activity." 18 U.S.C. § 1961(5) (emphasis added). The Supreme Court has said that this definition implies "that while two acts are necessary, they may not be sufficient." *Sedima, S.P.R.L. v. Imrex Co.,* 105 S.Ct. at 3285 n. 14. The Senate Report on RICO, which was quoted by the Court when it discussed the problem of defining the pattern requirement, provides guidance on what transforms individual acts into a pattern of racketeering activity: "The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Id.* (quoting S.Rep. No. 91–617, 91st Cong., 1st Sess. 158 (1969) (emphasis added by the Court)).

Racketeering acts, then, do not constitute a pattern simply because they number two or more. The constituent elements must be sufficiently related to one another and threaten to be more than an isolated occurrence. In trying to discern from this general guidance a useful definition of pat-

tern, the Court of Appeals for the Eighth Circuit has suggested that to constitute a pattern individual racketeering acts must amount to more than one criminal "scheme," because otherwise there is no threat of continuing activity. *Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257 (8th Cir. 1986). A problem with requiring more than one scheme, however, would be that "defendants who commit a large and ongoing scheme, albeit a single scheme, would automatically escape RICO liability for their acts, an untenable result." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986). Some courts have held that there must be more than one criminal "episode" for there to be a pattern. *E.g., Frankart Distribs., Inc., v. RMR Advertising, Inc.,* 632 F.Supp. 1198, 1200–01 (S.D. N.Y.1986). Under this approach, acts undertaken in furtherance of a single transaction, and performed within a limited period of time, are insufficient to constitute a pattern. *Id.* at 1201.

We decline to adopt a definition of pattern that relies solely on whether activity can be classified as a single scheme or episode. Shifting the focus to such terms merely substitutes one set of definitional problems for another. Furthermore, given the indeterminate nature of the statutory language, and the subtleties inherent in looking for "continuity plus relationship," no one characteristic can be considered as controlling in determining whether a pattern exists. *Cf. Morgan v. Bank of Waukegan,* 804 F.2d at 975 (identifying several factors relevant to determining whether a pattern exists). In attempting to identify the order of magnitude at which acts constitute a pattern, the courts recognize that acts can be so closely interrelated in function and connected in time that the "threat of [a] continuing activity" factor is absent. *See, e.g., Marks v. Forster,* 811 F.2d 1108 (7th Cir.1987). A bribe, which by any realistic appraisal is solitary and isolated, is not transformed into the threatening "pattern of racketeering activity" with which Congress was concerned simply because the bribe is implemented in several steps and involves a number of acts of communication. *See Superior Oil Co. v. Fulmer,* 785

F.2d at 257; *Eastern Corporate Fed. Credit Union v. Peat, Marwick, Mitchell & Co.,* 639 F.Supp. 1532, 1535 (D.Mass. 1986). This is especially true when the acts involve mail and wire fraud. "In today's integrated interstate economy, it is the rare transaction that does not somehow rely on extensive use of the mails or the telephone." *Eastern Corporate Fed. Credit Union v. Peat, Marwick, Mitchell & Co.,* 639 F.Supp. at 1535.

In the scheme Roeder's complaint portrays, which is based on the charges in the indictment of Alpha and DeCarolis, defendants paid $57,000 to Adamsky so that he would use his influence in obtaining subcontracts for Alpha for the ALQ 119/184 program. The bribe was paid in three installments disguised as payments for a marketing study. Eleven phone calls and eight letters were exchanged among defendants and Adamsky for the purpose of executing the payment. It is only because of the way in which the bribe was paid that an event obviously not constituting a pattern can be distorted into one. All of the racketeering acts Roeder alleges relate to a single instance of bribery. There is no suggestion that defendants used similar means to obtain other subcontracts, or that they bribed anyone else. RICO is "not aimed at the isolated offender." *Sedima, S.P.R.L. v. Imrex Co.,* 105 S.Ct. at 3285 n. 14 (quoting 116 Cong.Rec. 35193 (1970) (statement of Rep. Poff)). We hold that the bribery of Adamsky did not constitute "a pattern of racketeering activity."

## IV. CONCLUSION

We affirm the district court's decision to dismiss both counts of Roeder's complaint. With respect to the securities fraud claim, we rule that the complaint fails because it does not allege facts giving rise to a duty to disclose. As to the RICO claim, the complaint does not state injuries caused "by reason of" the alleged racketeering acts, and the facts alleged do not constitute a "pattern of racketeering activity" as required by RICO.

*Affirmed.*