In re **NEW AMERICA HIGH INCOME FUND SECURITIES LITIGATION.**

**This Document Relates To: All Consolidated Actions.**

No. 90–10782–MA.

United States District Court, D. Massachusetts.

Aug. 26, 1993.

Order and Judgment Aug. 27, 1993.

Robert S. Kitchenoff, Kohn, Savett, Klein & Graf, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Nancy Gertner, Dwyer, Collora & Gertner, Boston, MA, Marvin A. Miller, Chertow & Miller, Chicago, IL, Elwood S. Simon, Elwood S. Simon & Associates, Bloomfield Hills, MI, Robert Harwood, Wechsler, Skirnickarwood, Halebian & Feffer, Scott W. Fisher, Bruce

E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York City, Eugene A. Spector, Robert M. Roseman, Spector & Roseman, Philadelphia, PA, Edward F. Haber, Shapiro, Grace & Haber, Boston, MA, for plaintiffs.

John D. Donovan, Jr., Kathryn Selleck, John D. Donovan, Ropes & Gray, Ivan B. Knauer, Ropes & Gray, Patricia A. Early, Jeremiah T. O'Sullivan, Choate, Hall & Stewart, Boston, MA, Peter M. Saparoff, Helen A. Robichaud, Palmer & Dodge, Boston, MA, J. Dennis Faucher, Paula D. Shaffner, Saul, Ewing, Remick & Saul, Philadelphia, PA, James G. Rosenberg, James G. Rosenburg, David R. Moffitt, Paul C. Madden, Saul, Ewing, Remick & Saul, Philadelphia, PA, for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

New America High Income Fund ("the Fund") is a management investment company trading in high yield bonds. More than three years ago, on March 27, 1990, a number of individuals who had invested in the Fund ("the plaintiffs")[1], initiated litigation against the investment company alleging a variety of securities-related claims.[2] Since then, this litigation has undertaken a frustrating and uneven course.[3] The present Memorandum and Order marks its latest, and perhaps last stop at this level.

After a misstart, volumes of motions, and hearings, the plaintiffs complaint against the Fund, several of its officers and directors, and its underwriters (collectively "the defendants")[4] has been whittled down to two claims. The plaintiffs' surviving claims are that the defendants violated § 11 and § 12(2) of the 1933 Securities Act, 15 U.S.C. §§ 77k, 77*l*(2) (1988),[5] by making misrepresentations in the prospectus which accompanied the Fund's initial public offering. Specifically,

1. The list of plaintiffs includes Mary Bruce, Pete and Pat Bomireto, C.H. Ruhmann, Robert Lucia, Eric A. Miller, John Silak, Peter L. and Carol H. Straus, Helen Palmquist and Mariam S. Posner.

2. Though these plaintiffs originally filed separate actions, they were consolidated when the plaintiffs filed their Second Amended Class Action Complaint. *See In re: New America High Income Fund Securities Litigation,* Master File No. 90–10782–MA (March 13, 1992).

3. The arduous history of this case need not be rehashed here since it is described fully in an earlier memorandum of this Court. *See* Memorandum and Order, *In re: New America High Income Fund Securities Litigation,* Civil Action No. 90–11055–MA, 755 F.Supp. 1099 (January 9, 1991).
   One of the chief reasons for the undue complexity of this case has been the parallel existence of a virtually identical case that was never joined—*Lucia v. Prospect Street High Income Portfolio, Inc.,* 769 F.Supp. 410. The two cases involve the same claims made by many of the same plaintiffs against almost identical prospectuses. It remains unclear why the parties never consulted or organized themselves more completely. Nevertheless, in keeping with the divided posture of these cases up to this point and to avoid confusion, I issue almost identical individual memoranda to address these Siamese actions separately. See Memorandum and Order, *Lucia v. Prospect Street High Income Portfolio, Inc.,* Civil Docket No. 90–10781–MA (August 26, 1993).

4. In addition to the Fund, the list of defendants includes Ostrander Capital Management Corp. ("OCM"), investment adviser to the Fund; Patricia Ostrander, President and a director of the Fund and President of OCM; Franco Modigliani, Joseph L. Bower, Bernard J. Korman, Ernest E. Monrad, Richard E. Floor, directors of the Fund; Ellen Terry, Vice President of the Fund; and Butcher Corporation and Bateman Eichler, Hill Richards, Inc., underwriters of the Fund's stock offering.

5. These two sections of the 1933 Securities Act state, in relevant part:

   > In case any part of the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may, either at law or in equity, in any court of competent jurisdiction, sue [the responsible parties].

   15 U.S.C. § 77k(a).

   > Any person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ..., shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income

the plaintiffs assert that the prospectus ("the Prospectus") painted a misleadingly bright picture of the historical strength of the high yield bond market. The defendants disagree and have moved for summary judgment. The matter now comes before me on that motion.

## I. *The Prospectus*

On February 19, 1988, in order to inform the market of the Fund's investment features and to attract financial participation, the Fund made a public offering of its stock and issued its Prospectus. This case focuses exclusively on the truthfulness of that Prospectus and the accuracy and completeness of the defendants' disclosures. Consequently, at the outset, I quote that portion of the Prospectus which contains the allegedly misleading statements.

The Prospectus states:

> The Fund's portfolio will consist primarily of "high yield" corporate bonds. The "high yield" bond market totaled approximately $160 billion principal amount as of December 31, 1987, excluding convertible bond issues. Since 1977, approximately 750 industrial and finance companies have issued in excess of $111 billion principal amount of publicly traded, non-convertible, "high yield" debt.

> "High yield" bonds offer a higher yield to maturity than bonds with higher ratings as compensation for holding an obligation of an issuer perceived to be less credit worthy. The DBL Composite measures the performance of the most representative bonds in the "high yield" market and is compiled monthly by Drexel Burnham Lambert Incorporated. As of December 31, 1987, the DBL Composite offered a yield spread of 484 basis points (i.e., 4.84%; 1% equals 100 basis points) over the comparable Treasury security, 7% U.S. Treasury due 1994. U.S. Treasury securities are considered to have minimal risk. The average spread between the DBL Compos-

ite and the comparable U.S. Treasury issue was 358 basis points for 1980, 397 basis points for 1981, 503 basis points for 1982, 337 basis points for 1983, 311 basis points for 1984, 362 basis points for 1985, 496 basis points for 1986 and 451 basis points for 1987.

> For the years 1977 through 1986, the spread in yields between "high yield" securities and representative U.S. Treasury securities has averaged approximately 393 basis points. For this period, the loss in principal and interest due to defaults on "high yield" securities has averaged approximately 97 basis points. Thus, for the period 1977 to 1986, the net average spread between "high yield" securities and representative U.S. Treasury securities (i.e., the average spread between "high yield" securities and U.S. Treasury securities, minus the net average default loss on "high yield" securities) was 296 basis points. For 1987, the loss of principal and interest due to defaults is estimated to have been 125 basis points.* However, past performance is not necessarily indicative of future performance.

> * Statistical data appearing above are based on information provided by Drexel Burnham Lambert Incorporated.

Defs.' App. to Statement of Material Facts, Ex. 2A at 7 [hereinafter *Prospectus*]. Before embarking on a legal analysis of the Prospectus, especially the above paragraphs, I summarize the standard for summary judgment in the securities fraud context.

## II. *Summary Judgment Standard*

■■■■ Summary judgment is appropriate where the moving party shows there are no genuine issues as to any material facts and that it is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Shein-kopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991). The moving party bears the burden of proving that no material issue of fact exists.[6] *Celotex Corp. v. Catrett*, 477 U.S.

---

received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l* (2).

**6.** This burden is met relatively easily, though. The party seeking summary judgment has only to inform the district court of the basis for its motion and identify the evidence which shows the absence of a genuine issue of fact. *Celotex Corp.*

317, 321, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986); *Capri Optics Profit Sharing v. Digital Equipment Corp.*, 760 F.Supp. 227, 230 (D.Mass.1991), *affirmed on other grounds*, 950 F.2d 5 (1st Cir.1991). The burden then shifts to the nonmoving party to demonstrate that there are genuine factual issues which preclude summary judgment. *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989).

An issue is "genuine" when the nonmovant presents "sufficient evidence" to support the nonmovant's conflicting view of the facts, which then requires the case to be submitted to a factfinder for resolution. *Finn v. Consolidated Rail. Corp.*, 782 F.2d 13, 16 (1st Cir.1986) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). To meet this burden, the nonmovant must adduce more than a "scintilla of evidence" establishing its version of facts. *Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir.1992). In addition, that evidence must be introduced by affidavit, and it must be in admissible form. Fed.R.Civ.P. 56(e); *Finn*, 782 F.2d at 16; *cf. Soar v. National Football League Players' Ass'n*, 550 F.2d 1287, 1289 n. 4 (1st Cir.1977) (mere promise to produce admissible evidence at trial not adequate). With these principles in mind, I turn now to the merits of the competing motions.

III. *Analysis*

The defendants have moved for summary judgment, asserting that there is no genuine issue of material fact and arguing, as a matter of law, that the Prospectus was not misleading. The plaintiffs, however, make allegations, which, if credited, would give rise to genuine issues of material fact. Specifically, they assert that the defendants used inflated figures to compare the strength of the junk bond market with the market for government securities; the defendants failed to disclose the effect of "aging" on the default loss rate of bonds; the default loss rate quoted in the Prospectus did not account for "forced bond

exchanges;" and the Fund was predominantly invested in bonds related to leveraged buyouts and mergers and acquisitions ("LBO/M & A bonds"). The plaintiffs claim there is evidence to support these allegations and that, accordingly, there are genuine issues of material fact which preclude summary judgment. The plaintiffs alternatively ask for further time to conduct discovery to establish these facts. I consider these arguments in turn.[7]

First, the plaintiffs complain that the Prospectus overstated the historical strength of junk bonds relative to U.S. Treasury bonds. Based on the period from 1977 to 1986, the Prospectus states that on average junk bonds yielded 3.93% more annually than U.S. Treasury bonds. Prospectus, at .7. In contrast, the plaintiffs assert that the return on U.S. Treasury bonds from 1982 to 1987 exceeded the return on a diversified portfolio of junk bonds. Pls.' Mem. in Opp'n to Defs.' Motion for Summ. J., at 5 [hereinafter *Opp'n Mem.*]. The plaintiffs complain that by failing to disclose this more recent trend of weaker junk bond performance, the defendants gave a false impression to investors of the value of junk bonds. *Id.*

There is, however, no obligation to disclose all securities information simply because the market would be interested, as long as the data that is disclosed is accurate and complete. *See Backman v. Polaroid Corp.*, 910 F.2d 10, 13 (1st Cir.1990) (finding no duty to disclose information merely because it is material, or of interest to investors); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 25–26 (1st Cir.1987) (finding that "[m]ere market interest is no basis for imposing liability"); *cf. Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) (stating that duty to disclose "does not arise from mere possession of non-public information"). In *Polaroid*, the First Circuit addressed the issue of misleading securities disclosures at length. The court held that as long as mate-

*v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party does not need to negate the opponent's claim that there are genuine issues of material fact. *Id.*

7. Both parties address whether the statute of limitations bars the plaintiffs' claims. Because I find that the case is disposed of on other grounds, I do not reach the limitations question.

rial disclosures are accurate and complete, the failure to disclose other, related information, absent a specific duty to disclose, is not misleading. *Polaroid,* 910 F.2d at 13, 16. Thus, by revealing certain facts about a product, there is no obligation to disclose other, related facts of interest to the market. *Id.,* at 16. The disclosure of other, related facts is only necessary to insure that what was originally revealed was not so "incomplete as to be invalid." *Id.* (citation omitted).

In *Polaroid,* the photo company was sued by shareholders because the company allegedly misled investors as to the health of its subsidiary, Polavision, the manufacturer of a new movie camera. In Polaroid's Third Quarter Report, the President stated that the "[c]ompany's worldwide manufacturing facilities continue to operate at close to maximum capacity." *Id.,* at 15. The shareholders pointed out that, in fact, Polavision's contract supplier had been told shortly before the report's release to hold up on 20,000 units. *Id.* The First Circuit did not agree with the shareholders that the President's statement was misleading. The court found that the President's statement "expressly recognized an absence of totality." *Id.* In other words, the President never stated that operations were at full capacity. The court added that the Third Quarter Report revealed in three separate instances that Polavision was negatively affecting earnings. *Id.,* at 16. Thus, the First Circuit concluded that the quarterly report had not misled investors as to Polavision's health. *See id.*

■ The First Circuit also held that it was not misleading for Polaroid either to disclose that Polavision was selling below cost, without saying how much below, or to fail to report that Polavision's sales figures were below expectations. *Id.* In dicta, however, the court stated that it would have been a material misrepresentation if Polavision

had become "a commercial failure" and Polaroid had not informed investors. *Id.* Yet based on uncontroverted evidence, Polaroid was convinced of the eventual success of Polavision at the time the quarterly report was published. *Id.* Based on the *Polaroid* decision, I conclude that a company can choose which trade data to issue, so long as it is accurate and substantially informs investors of company weaknesses and possible investment risks. Thus, I find that in the present case it was not misleading for the defendants to use the 1977–1986 period as a baseline for comparing the yields of junk bonds and U.S. Treasury bonds, though it paints a much rosier picture of the relative strength of junk bonds than the 1982–1987 period allegedly does.

■ Second, the plaintiffs claim that the Prospectus did not disclose the effect of "aging" on the default rate of bonds. *See* Opp'n Mem., at 13. According to a study by Professor Paul Asquith ("the Asquith Study"), the rate of bond defaults is related to the age of the bonds. *See* Pls.' App., Ex. E at 10–11, 23 [hereinafter *Asquith Study* ]. As bonds age, the study concludes, their default rate rises. *Id.* According to the study, the default rate for bonds issued in 1977 and 1978 was 34% by December 31, 1988, in contrast to the default loss rate of less than 1% quoted in the Prospectus.[8] *See id.,* at 23.

The Asquith Study, however, was not completed until April, 1989, at which time the findings were also made public in various newspapers and business journals. As Professor Asquith points out in an affidavit submitted to this Court, it would have been impossible for the defendants to have known of the effect of aging on bond default rates at the time the Prospectus was issued in early 1988, because no study of this kind was yet available.[9] Defs.' App. to Statement of Material Facts, Ex. 1 at ¶¶ 5, 14 [hereinafter

8. Though somewhat illuminating, comparing the default rate with the default loss rate is a bit imprecise since they do not measure exactly the same thing. While the default rate measures the total number of defaulted bond issues, the default loss rate measures the same defaults in terms of dollar losses and factors in gains from post-default bond sales. Thus, the default loss rate invariably will be a fraction lower than the default rate for the same set of bonds.

9. Dr. Edward Altman released a related study on the "mortality" rate of bonds in December, 1988, ten months after the Prospectus was published. Asquith Aff., ¶ 13. Aside from the research of Dr. Altman and Professor Asquith, no other comparable work was being done at the time. *Id.*

*Asquith Aff.*]. Thus, I conclude that the defendants were, as they assert, unaware of the effect of aging on bonds when they issued the Prospectus, and I hold that the omission of an aging analysis from the Prospectus was not intended to, and did not, mislead.

■ Moreover, as a legal matter, the defendants had no duty to disclose a default rate that took account of the aging of bonds, though the plaintiffs assert it would have been of interest to them as potential investors. There are at least two ways to determine the default rate of bonds, one by calculating the total number of defaults in a particular year, the other by tracing the number of defaults of a closed set of bonds over a more extended period to determine the effect of age on default rates. Each method is valid and serves different purposes. The former approach, which the defendants employed in determining their default loss rate, is useful for those investors who plan to trade their junk bonds, because it informs them of the present risk of holding onto those bonds. The latter, age-sensitive approach is appropriate for buy-and-hold investors who do not plan to sell their bonds before maturity. Though potentially of interest to the market, it is not necessary to disclose in a prospectus all variations of a similar statistic, as long as the ultimate disclosure is accurate and complete. *See Polaroid*, 910 F.2d at 13; *Roeder v. Alpha Industries, Inc.*, 814 F.2d at 25–26.

The same principle applies with even more force to the situation where, as here, the alternative statistic—the age-sensitive default rate—has not even been discovered by the time the prospectus is issued. There is simply no legal requirement for securities firms to conduct research on potentially material subjects, which would then be disclosed if relevant. In the first place, such research can be enormously taxing. It took Professor Asquith one and a half years to complete his study. Asquith Aff., at ¶ 14. In addition, there is no guarantee of any worthwhile results.[10] Consequently, I conclude, as a matter of law, that the default rate that was disclosed was not misleading.

■ As a third ground for opposing summary judgment, the plaintiffs allege that the default loss rate listed in the Prospectus ("the DBL default loss rate") failed to include losses from "forced bond exchanges." There are instances where bonds lose value, yet are exchanged for a new package of securities before defaulting. Defs.' App. to Statement of Material Facts, *Lucia v. Prospect Street High Income Portfolio, Inc.*, Civil Docket No. 90–10781–MA, Ex. D at ¶ 11 [hereinafter *Altman Aff.*].[11] Though these bonds usually have more value than defaulted ones—which historically yield 40 cents on the dollar—these forced bond exchanges still produce sizeable losses for investors. *Id.* Therefore, the plaintiffs contend it was misleading for the defendants not to include data on forced bond exchanges in their default loss rate.

■ The plaintiffs, however, present no facts to support their contention that data on forced bond exchanges was omitted. As previously noted, the nonmovant opposing summary judgment must go beyond merely asserting the existence of a disputed and material fact. *See Sheinkopf v. Stone*, 927 F.2d at 1262. The nonmovant must produce evidence that substantially proves the existence of such a disputed fact. *See id.* (stating that

10. Even once the Asquith Study was made public, the defendants still had no duty to report its age-sensitive bond default rate, because the Prospectus explicitly disclaimed any guarantee of future bond performance. *Cf. Polaroid*, 910 F.2d at 16–17 (asserting that where a statement has a forward informational intent, there may be obligation to report future information that affects continued validity of original statement). After making favorable comparisons between the historical performance of high yield bonds and U.S. Treasury securities, the Prospectus warned that "past performance is not necessarily indicative of future performance." Prospectus, at 7.

11. The affidavit of Dr. Edward Altman, an expert in the area of high yield bonds, was not submitted by either party in this case. It was submitted, however, by the defendants in the related *Prospect Street* case, Civil Docket No. 90–10781–MA. I take judicial notice of the Altman affidavit, because it offers a helpful explanation of some of the same financial terms also involved in the present case and it speaks to background matters which are not in dispute here. Where I do refer to the Altman affidavit, *infra*, with respect to contested issues, I do so only to supplement the record. The affidavit is not critical to my findings.

nonmovant's evidence must be "significantly probative" of the existence of material fact issues). Without any such evidence, the plaintiffs fail to meet that evidentiary burden of proof.

Moreover, there is support for the defendants' contention that the DBL default loss rate did take the losses from forced bond exchanges into account. By 1988, Drexel Burnham Lambert was including forced bond exchanges in its definition of "default." *See* Drexel Burnham Lambert's "1988 Annual High Yield Market Report" (March, 1988), Defs.' App. to Statement of Material Facts, Ex. 1D, at 20. This Court can logically presume, therefore, that the DBL default loss rate, quoted in the defendants' 1988 Prospectus, also factored in forced bond exchanges. Moreover, all high yield bond indexes, including indexes created by Drexel Burnham Lambert, factor in the returns (losses) from forced bond exchanges, according to Dr. Altman. Altman Aff., at ¶ 12. This evidence, and the lack of countervailing material from the plaintiffs, persuades me that the defendants' default rate did, in fact, take forced bond exchanges into account.

■ Furthermore, the omission of forced bond exchange information would have only had a marginal effect on the default rate and must therefore be considered immaterial. Information is material when its disclosure alters the "total mix" of facts available to an investor and there is a "substantial likelihood" that a reasonable investor would consider it important to an investment decision. *Milton v. Van Dorn Co.*, 961 F.2d at 969. In the present case, the Prospectus explicitly discloses the risk of investing in junk bonds. For example, the opening paragraph of the Prospectus states:

These securities are regarded by [Standard & Poor's], on balance as predominantly speculative with respect to capacity to pay interest and repay principal in accordance with the terms of the obligation. An investment in the Fund may not be appropriate for all investors, and no assur-

ance can be given that the Fund will achieve its investment objective.

Prospectus, at 1 (citations omitted). *See also supra* note 8. Thus, the "total mix" of facts provided to investors fairly alerted them to the risk of investing in the Fund.

Moreover, the impact of forced bond exchanges on the DBL default loss rate has been found to be negligible. Altman Aff., at ¶ 17. Therefore, even if data on forced bond exchanges was not included in the defendants' default loss rate, I still believe that the warning in the Prospectus about investing in the Fund would have been sufficient. Consequently, I find the alleged exclusion of data relating to forced bond exchanges immaterial.

■ As a final ground for opposing summary judgment, the plaintiffs claim that the guarantee in the Prospectus of a diversified bond portfolio was misleading because they allege the Fund was, in fact, overladen with LBO/M & A bonds.[12] Though the Prospectus did advertise an intention to diversify the Fund's bond holdings, it never gave a precise, numerical breakdown of the kinds of bonds it would seek to purchase. Therefore, unless the Fund was clearly dominated by LBO/M & A bonds, the Prospectus could not be construed as misleading on this point.

In fact, the available evidence indicates not only that LBO/M & A bonds played a minor role in the Fund, but that they also generally outperformed other bonds in the Fund. First, only 2 of 177 securities purchased were LBO/M & A bonds that defaulted. Defs.' Joint Summ.J.Mem., at 35. Second, while the Fund's average default loss was 0.97%, the default loss due to nonperforming LBO/M & A bonds was only 0.44%. *Id.*, at 35–36. Third, the Fund actually made $7,530,847 as a result of its portfolio of LBO/M & A bonds. *Id.*, at 36. Thus, given the relatively strong performance of LBO/M & A bonds and the lack of evidence that they exerted undue influence in the Fund, I find that it was not misleading for the defendants

**12.** The plaintiffs presumably believe that LBO/M & A bonds are more likely to default than ordinary, "growth stage" high yield bonds. There is no evidence, however, to support that belief, as

no study on the question has yet been conducted. Asquith Aff., at ¶ 22. Moreover, such a proposition is contradicted by the Fund's actual performance. *See infra.*

**510**

to advertise the Fund as a diverse portfolio of junk bonds.

Failing to prevail on the merits of their opposition, the plaintiffs alternatively argue that summary judgment will be premature if they are not allowed further discovery to gather additional evidence. Opp'n Mem., at 10. On August 7, 1992, however, this Court denied a similar motion by the plaintiffs to compel discovery of the defendants and their experts. Pls.' Motion to Compel Deposition of All Defendants. The Court held that the plaintiffs already "have sufficient facts at their disposal to oppose a motion for summary judgment." *Id.* The circumstances since that earlier order have not changed.

Additionally, the plaintiffs must make a reasonable showing that such discovery would yield relevant evidence in support of their claims. *See Hoffman v. Reali,* 973 F.2d 980, 987 (1st Cir.1992) ("[A] plaintiff's entitlement to discovery before a ruling on summary judgment is not unlimited and may be cut off when the record shows that the requested discovery will not be likely to produce facts he needs to withstand a summary judgment motion."); *Milazzo v. Sentry Ins.,* 856 F.2d 321, 322 (1st Cir.1988) ("Discovery is not 'a fishing expedition'; parties must disclose some relevant factual basis for their claim before requested discovery will be allowed."); *MacKnight v. Leonard Morse Hosp.,* 828 F.2d 48, 52 (1st Cir.1987) (plaintiff required "to disclose some relevant facts and basis for them before the requested discovery would be allowed"). The plaintiffs, however, have not made the necessary, threshold showing that more discovery will produce material evidence. *See Affidavit of Mark S. Goldman,* at ¶¶ 18–23. All the plaintiffs have done is to state what information they would seek from the defendants if given the opportunity. *See id.* Therefore, further discovery is unwarranted.

I find that the case is now ripe to be resolved on the merits. Accordingly, pursuant to the foregoing, I conclude that there are no genuine issues of material fact still to be decided and that, as a matter of law, the Prospectus was not misleading. Thus, the defendants' motion for summary judgment is granted.

SO ORDERED.