Ronald KENNEDY, Plaintiff,

v.

CHOMERICS, INC., et al., Defendants.

Civ. A. No. 85–4810–MA.

United States District Court,
D. Massachusetts.

June 3, 1987.

John J. McDonough, DiMento & Sullivan, Boston, Mass., for plaintiff.

Stephen H. Ahern, W.R. Grace & Co., Cambridge, Mass., Robert S. Frank, Choate, Hall & Stewart, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The plaintiff, Ronald Kennedy, has brought this action for securities fraud against Chomerics, Inc., and a number of the company's directors and officers. Kennedy charges the defendants with violating federal and California law by making false statements in materials distributed to shareholders of Chomerics and filed with the Securities and Exchange Commission ("SEC"). The case is now before me on the defendants' motion for summary judgment. Kennedy has filed an opposition and both sides have filed supporting memoranda. For the reasons stated below, I grant the motion.

### 1. Facts

The following facts, drawn from the defendants' statement of undisputed facts and papers submitted by Kennedy, are not in dispute.[1] From 1973 until early 1985, Kennedy was a Chomerics stockholder. In October 1983, Chomerics received from a

shareholder, Richard Westin, a resolution urging the company's officers and directors to "give serious thought to causing the Company to become an acquisition candidate so that the shareholders may realize the full economic value of their common stock." On April 27, 1984, Chomerics mailed proxy materials which included the Westin proposal to its shareholders. In these materials, management recommended against the Westin proposal, stating:

The Board of Directors and the executive officers of the Company continuously consider alternative strategies for the Company. They believe that continued development of the Company in accordance with the present business plan presents the best prospect for the stockholders of the Company.

Kennedy read the proxy statement on May 1 or 2, 1984. On May 4, 1984, three weeks before the stockholder vote on the Westin proposal, he purchased 5,000 shares of Chomerics stock. At the annual shareholders meeting on May 24, 1984, the Westin proposal was soundly defeated. Six days later, Kennedy purchased an additional 500 shares of stock.

In early July of 1984, Chomerics' chief executive officer, Robert Jasse, met with the company's vice president, Larry Mihalchik, to discuss the possibility of selling Chomerics to, or merging it with, another company. Mihalchik then met with representatives of Salomon Brothers to explore engaging that company for advice as to selling Chomerics. Jasse met in late July with Carl Graf, the chairman of W.R. Grace & Co., who was an old acquaintance. At that meeting, they discussed whether Chomerics would be a possible acquisition candidate for W.R. Grace.

The subject of selling Chomerics was formally discussed at a Chomerics board meeting on August 27, 1984. The minutes of that meeting reflect that the directors initially approved a resolution that the company's officers explore a possible sale or

---

1. Despite the requirements set forth in Local Rule 18, Kennedy failed to file a statement of undisputed facts.

merger and that Salomon Brothers be retained to act as that company's financial adviser and investment banker. The minutes further reflect, however, that after more discussion, the directors decided to "suspend further action" regarding a sale or merger until a number of major issues could be decided. The Board did not vote to explore a possible combination of Chomerics with a larger organization until its November 8, 1984 meeting, when it authorized management to engage the firm of F. Eberstadt & Co. for investment banking advice.

Between the date the Chomerics management recommended against the Westin proposal and the date the Board voted to engage Eberstadt for advice on a possible sale or merger, plaintiff Kennedy did not receive any materials from Chomerics indicating that the company was considering such a sale or merger. The company's July 24, 1984 letter to its shareholders states merely that "[t]hrough the half-way point of 1984, we are following our business plan well." Its November 5, 1984 letter is completely silent as to the company's business plan or possible sale. Chomerics' Form 10–Q quarterly report, filed with the SEC on August 2, 1984 and sent to Kennedy, sets forth the text of the Westin proposal and the tally of the votes cast for and against it. This Form 10–Q did not repeat management's statement in opposition to the proposal.

After Kennedy's purchase of 5,500 shares of Chomerics stock in May 1984, he neither purchased nor sold Chomerics stock for a number of months.[2] He then sold all of his stock in a series of six transactions, with the first sale on December 31, 1984, twenty days after he lost a long-running litigation and arbitration proceeding against Chomerics concerning his employment in the 1970s. Kennedy's final sale of Chomerics stock took place on February 22, 1985. The prices Kennedy received for this stock ranged from $20 to $25 per share.

On March 5, 1985, Chomerics and W.R. Grace executed an agreement in principle containing the terms by which Chomerics would be merged into a subsidiary of W.R. Grace. Chomerics announced that agreement in principle publicly the same day. Immediately thereafter, shares of Chomerics traded for $32 per share.

### 2. *The Securities Fraud Claims*

Kennedy's amended verified complaint contains five counts. Count I charges that the defendants knowingly made false and misleading statements of material fact and omissions of material fact in the April 27, 1984 proxy statement, the two letters to the stockholders, and the August 2, 1984 Form 10–Q quarterly report. These actions on the part of the defendants allegedly violated Section 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S. C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Count II avers that the defendants violated Section 14(a) of the Act, 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9, through making false and misleading statements and omissions in the proxy statement and proxy solicitation of April 27. Count III charges a violation of Section 18(a) of the Act, 15 U.S.C. § 78r(a), which prohibits false statements in material filed with the SEC. Counts I through III further allege that Kennedy, without the knowledge that such statements were false and misleading, and relying on the defendants' statements that they were opposed to making Chomerics an "acquisition candidate," sold his 24,019 shares of Chomerics stock shortly before the March 5, 1985 public announcement of the merger with W.R. Grace & Co. He claims to have incurred a loss of $220,883.

Counts IV and V relate to claims under California law. In his opposition to the defendants' motion for summary judgment, Kennedy waives his Count IV claim. In Count V, Kennedy claims that the defendants violated the California Civil Code by

---

**2.** Before the May purchases, Kennedy had sold Chomerics stock on eight occasions between December 1981 and March 1984. During this period, he did not purchase any Chomerics stock.

concealing their intent to sell Chomerics to induce Kennedy to sell his stock.

### 3. *Standard of Review*

The defendants have moved for summary judgment on each of the remaining counts. Summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court "must examine the record 'in the light most favorable to ... the party opposing the motion.'" *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987) (quoting *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)). The moving party for summary judgment has the initial burden of proving that no genuine issue of material fact exists and that he is entitled to summary judgment as a matter of law. *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 929–930 (1st Cir.1983). If the movants meet that burden, it shifts to the opposing party to show that summary judgment is inappropriate. *Id.* at 929. The party opposing summary judgment must then establish the existence of a fact which is both "genuine" and "material" to defeat the motion. *Josephthal*, 814 F.2d at 804.

As the Supreme Court has recently explained, the existence of some factual dispute is not enough to defeat a summary judgment motion. Instead, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2110, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law governing a case defines what is material. *Id.* 106 S.Ct. at 2510. I now examine each of Kennedy's counts in turn to determine whether the defendants are entitled to summary judgment.

### 4. *Section 10(b) Claim*

■ The complaint's first count involves a claim under Section 10(b) of the Act and Rule 10b–5.[3] To establish a claim under Section 10(b) and Rule 10b–5, Kennedy must prove that the defendants, with scienter, falsely represented or omitted to disclose a material fact upon which Kennedy justifiably relied in deciding to sell his Chomerics securities. *Josephthal*, 814 F.2d at 804. Kennedy's first hurdle is to show that the defendants knowingly made a misleading or false statement or failed to disclose a material fact. In determining whether the defendants made such a statement, I consider the documents upon which Kennedy claims to have relied in deciding to sell his stock.[4]

### A. *Chomerics' Proxy Materials*

■ Kennedy alleges that the management statement in opposition to the Westin proposal, which was included in the April

---

**3.** Section 10(b) prohibits the use of any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe" in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b). The SEC has promulgated Rule 10b–5, which provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, ...

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....

17 C.F.R. § 240.10b–5.

**4.** At his deposition, Kennedy also claimed to have relied on either yet another Form Q quarterly report or a Form 10K report which accompanied Chomerics' 1984 Annual Report. This form purportedly restated the results of the vote on the Westin proposal. After further questioning, Kennedy acknowledged that this form could not have accompanied the Annual Report, as that document was not filed or distributed until after Kennedy had sold all his Chomerics stock and the W.R. Grace merger was announced. As Kennedy has been unable to identify the document or produce it, and as the allegedly misleading information contained within it (the restatement of the Westin proposal voting results) was also reported in the August Form 10–Q, I limit my consideration of the documents upon which Kennedy relied to the four described in his complaint.

proxy materials, is false or misleading. The statement was as follows:

> The Board of Directors and the executive officers of the Company continuously consider alternative strategies for the Company. They believe that continued development of the Company in accordance with the present business plan presents the best prospect for the stockholders of the Company.

The complaint avers that at the time the directors made that statement, they knew that "Chomerics was in fact an 'acquisition candidate' and that preliminary communications to that end were taking place between certain officers and directors of Chomerics and W.R. Grace & Co...." At his deposition, however, Kennedy admitted that he did not have any facts upon which he had based his allegation that Chomerics was an acquisition candidate as of April 27, 1984, the date of the mailing of the proxy materials. Nor could he offer any facts showing that discussions with W.R. Grace were already underway as of that date.

In his opposition, Kennedy does point to several facts from which he claims inferences could be drawn that Chomerics was an acquisition candidate as of April 27. Of these facts, only one deals with events which had occurred on or before that date. Kennedy states:

> Mr. Jasse stated that his decision to seek a sale of Chomerics was predicated on his dissatisfaction with his compensation package and his continued problems with Chomerics' president, Fletcher Anderson. (Jasse Depo. at 39–41). However, Mr. Jasse also testified that these perceived problems had been in existence over one year prior to his July 23, 1984 conference with Mr. Graf of W.R. Grace. (Jasse Depo. at 40).

While Kennedy accurately states Jasse's reasons for exploring a sale of Chomerics and the length of time Jasse had been dissatisfied there, he has presented no facts from which it could be inferred that Jasse's unhappiness at Chomerics had led him to explore a sale in his formal capacity as chief executive officer as of April 27. Kennedy has been unable to rebut the following evidence offered by the defendants through various affidavits: prior to July, 1984, management had rejected acquisition inquiries and had engaged Salomon Brothers for advice as to how to resist hostile takeover attempts; Jasse did not consider exploring a sale of Chomerics until July 1984; and the subject of a sale was first presented to all the directors of Chomerics at the August 27, 1984 board meeting where the directors voted not to explore a sale of the company at that time. Kennedy has not met his burden of presenting evidence from which it could be inferred that the Chomerics management had decided to seek a sale or merger of the company as of April 27, 1984.

### B. *The August Quarterly Report and Letters to the Shareholders*

■ Kennedy claims that because of their public opposition to the Westin resolution, the Chomerics management had a duty to disclose the fact that they were seeking a sale of the company in the August Form 10–Q quarterly report. This duty allegedly was made "more imperative in light of the July 24, 1984 letter to Chomerics stockholders in which management reiterated that it continued to follow the 'business plan,'" which management had referenced in its opposition to the Westin proposal. In addition, the company's failure to "mention a change in management's stated intentions" in the November 5 letter to the shareholders further "compound[ed] its prior misrepresentations."

The August Form 10–Q restated the Westin proposal and set forth the number of votes cast for and against it, in compliance with SEC rules requiring a brief description of matters voted upon by the shareholders and a tally of the votes. It did not mention management's opposition to that proposal or state management's present intentions regarding a sale.

In assessing Kennedy's claim, I keep in mind what is not at issue. He does not suggest that the restatements of the Westin proposal and vote tally in the Form 10–Q are inaccurate. Nor does he assert that management had some sort of inde-

pendent duty to reveal the existence of preliminary negotiations, if any were underway, as of the date of the letters to the shareholders or the quarterly report. Kennedy's claim instead relies on the proposition that management's opposition to a sale in the proxy materials had continuing force beyond the May 24, 1984 annual meeting, and that once management decided to pursue a sale, its failure to inform the shareholders of its new intentions in the letters or quarterly report made the import of those documents misleading.

I do not believe that the management statement in opposition to the Westin proposal could be construed to have continuing validity beyond the date of the annual meeting. The management statement informs the shareholders that those in management "continuously consider alternative strategies for the Company." This statement thus declares that management had considered and would continue to consider strategies such as that proposed in the Westin resolution. Management's view of that specific proposal is then phrased in the present tense: "They believe that continued development of the Company in accordance with the present business plan presents the best prospect for the stockholders of the Company." There is no indication that management's opposition to a consideration of a sale would continue in the future. At his deposition, Kennedy, a savvy investor who has supported himself for the past ten years by making investments, stated that he understood management's statement to mean *"at that time* that the company did not wish to look for somebody to purchase the business." (emphasis added). In light of the wording of the management statement in the proxy materials, Kennedy has not shown that the failure to mention the possibility of a sale in the letters or reports was misleading.

Kennedy also implies that the reference to Chomerics' "business plan" in the July letter could be construed as an affirmative statement that the company was not seeking a sale. While this inference is doubtful at best, in any event the letter is not misleading because Kennedy has offered no facts which show that as of July, the company had abandoned its "business plan" to seek a sale.

The defendants vigorously deny that the company was undergoing even preliminary negotiations in July, and they offer the following scenario. Chomerics' chief executive officer, Robert Jasse, indeed met with the chairman of W.R. Grace & Co., Carl Graf, on July 23, 1984 to discuss the possibility of selling Chomerics to W.R. Grace. However, Jasse was pursuing a personal, rather than a corporate, agenda at that meeting because of his unhappiness with his compensation as chief executive officer and difficulties with Chomerics' president, Fletcher Anderson. This meeting took place without the knowledge or approval of the board of directors. Chomerics' corporate strategy did not change until the board voted to explore selling the company at the November board meeting. It was not until this time that preliminary negotiations were undertaken with several companies, including W.R. Grace.

In support of these assertions, the defendants offer the following: an affidavit by Larry Mihalchik, a vice president of Chomerics with whom Jasse had informally discussed the possibility of a sale; Jasse's deposition testimony; the minutes of the August 27 meeting of the Chomerics board of directors, during which the Board initially approved and then suspended action regarding a proposal to explore selling the company; and the minutes of the November 8 board meeting where the directors retained Eberstadt to give the company advice on a possible sale or merger.

Kennedy does not offer facts tending to rebut the defendants' version of events. While it is true that Jasse provided Graf with certain materials relating to Chomerics at their July meeting and promised to send him more information, there is no evidence which would indicate Jasse was acting with the knowledge or approval of Chomerics' board of directors. The tentative nature of Jasse's contact with his old acquaintance instead is underscored by the fact that Jasse did not send Graf the additional material promised. Kennedy also points to the fact that after Jasse approached Mihalchik in early July, Mihalchik explored with Salomon Brothers the possi-

bility of acting as Chomerics' investment banker in the event of a sale of the company. Salomon Brothers responded with an engagement letter, which referred to "a possible sale" of Chomerics. Kennedy has produced no facts, however, rebutting the defendants' assertion that at this point management did not intend to pursue such a sale, as evidenced by the decision at the August board meeting to suspend action regarding a sale. Moreover, when the board did vote to explore a sale in November, it engaged F. Eberstadt & Co., not Salomon Brothers, as its investment broker. This fact supports the defendants' assertion that Mihalchik's discussions with Salomon Brothers were not undertaken with the board's knowledge or approval.

Kennedy also relies on some notes made by Mihalchik before a July 18, 1984 meeting with Salomon Brothers which refer to a "Grace Meeting" and to "pooling vs. purchase." [5] These notes, he argues, show that Jasse's July 23 meeting with Graf was held with the knowledge of the board of directors or other management of Chomerics. The only inference which could be drawn from these notes, however, is that Mihalchik knew about the upcoming Jasse-Graf meeting, a fact which the defendants acknowledge is true. On the other hand, inferences contrary to Kennedy's position can be drawn from these same notes, for item 20 in Mihalchik's notes reads: "Bob J.[asse]—Directors do not know."

Contrary to Kennedy's assertions, neither Mihalchik's reference to "pooling vs. purchase" nor an additional reference to "pooling of interests" in August correspondence to Mihalchik tends to show that W.R. Grace and Chomerics had proceeded far enough in negotiations to focus on the specific accounting treatment which would have to be approved by the SEC before a deal could be consummated. As stated previously, the board decided to suspend enactment of the resolution to explore a sale of the company in late August. Kennedy has put forward absolutely no facts from which it could be inferred that Mihalchik's exploration of these accounting principles

was done with the knowledge or approval of the board, or that his inquiries were tied to a specific deal with W.R. Grace.

Kennedy had not produced facts from which it could be inferred that the company distributed documents containing false or misleading statements or omissions. I grant the defendants' motion for summary judgment on the Section 10(b) and Rule 10b–5 claim.

### 5. *Section 14(a) Claim*

The complaint's second count alleges that the defendants violated the federal securities laws through their issuance of the misleading proxy statement and solicitation of April 27. Section 14(a) of the Act and Rule 14a–9 promulgated thereunder make it unlawful for a corporation to issue a proxy statement "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading...." 17 C.F.R. 240.14a–9(a). *See* 15 U.S.C. § 78n(a). The plaintiff has the burden of showing that the proxy statement is materially misleading through its misstatements or omissions. *See Pavlidis v. New England Patriots Football Club, Inc.*, 737 F.2d 1227, 1232 (1st Cir.1984).

For the reasons stated above in Part 4, Kennedy has not met his burden of producing facts which show that management's statements in opposition to the Westin proposal contained in the April 27 proxy materials were false or misleading when made or when the vote was taken. There is absolutely no evidence tending to show that Chomerics was not following its "business plan" and had undertaken efforts to sell the company as of April or May 1984. The defendants' motion for summary judgment on Count II is granted.

### 6. *Section 18(a) Claim*

Count III of the complaint alleges that the defendants knowingly made false

---

**5.** "Pooling vs. purchase" refers to different principles of acquisition accounting treatment. The merger with W.R. Grace was not finalized until

the SEC allowed that company to utilize "pooling of interests" accounting for the transaction.

and misleading statements of material fact and omissions of material fact in the August Form 10–Q quarterly report filed with the SEC, in violation of Section 18(a) of the Act. Section 18(a) "creates a private cause of action against persons ... who 'make or cause to be made' materially misleading statements in any reports or other documents filed with the Commission, although the cause of action is limited to persons who, in reliance on the statements, purchased or sold a security whose price was affected by the statements." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979).[6]

As explained above in Part 4, Kennedy does not argue that the information contained in the Form 10–Q (the restatement of the Westin proposal and the tally of the shareholder votes) is incorrect. He instead claims that the Form 10–Q was materially misleading because it failed to state that management was no longer honoring the shareholders' vote against directing the company to explore a sale. For the reasons given above, the information contained in the form is not misleading. Management's mere recitation of the Westin proposal in the quarterly report does not imply that its opposition to the proposal, which was not repeated in the report, was still valid as of the date of the report. Nor has Kennedy shown that as of that date, Chomerics had in fact adopted a plan to seek a sale or merger. Count III is to be dismissed as well.

### 7. *California Law Claim*

■ Count V is based on an alleged violation of the California Civil Code. As all of the federal claims are being dismissed prior to trial, I need not recognize pendent jurisdiction over this state law claim. Nor

may I entertain the state law claim on the basis of jurisdiction conferred by diversity of citizenship, for both Kennedy and one of the defendants are residents of California. As Kennedy has not brought to my attention any unusual circumstances which might preclude me from refusing to hear the state law claim absent the federal claims, I decline to entertain the state law claim in Count V. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725–726, 86 S.Ct. 1130, 1138, 1139, 16 L.Ed.2d 218 (1966); *Daley v. Town of New Durham,* 733 F.2d 4, 8 (1st Cir.1984).

### 8. *Conclusion*

In accordance with the above, I grant the defendants' motion for summary judgment on Counts I, II, and III. I dismiss the claim in Count IV, which the plaintiff has waived, and the claim in Count V.

SO ORDERED.

---

**6.** Section 18(a) provides in relevant part:

Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder ... which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any

material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement....

15 U.S.C. § 78r(a).