**CAPRI·OPTICS PROFIT SHARING, Plaintiff,**

v.

**DIGITAL EQUIPMENT CORPORATION, Defendant.**

**Civ. A. No. 88–1295–Y.**

United States District Court,
D. Massachusetts.

March 22, 1991.

Robert Stolzberg, Boston, Mass., Joseph H. Weiss, New York City, for plaintiff.

William Patton, John Donovan, Jr., Ropes & Gray, Edmund Case, Testa Hurwitz & Thibeault, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

Capri Optics Profit Sharing ["Capri"] brought this class action under § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b)[1] and Rule 10b–5, 17 C.F.R.

---

**1.** 15 U.S.C. § 78j(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in

§ 240.10b–5,[2] alleging fraud on the market and misrepresentation.[3] Capri asserts that nine misleading statements, made by Digital representatives to various newspapers and through press releases, were designed to inflate the market price for Digital securities and concealed adverse facts concerning Digital's markets, business, management, financial condition and future prospects. The disputed statements allegedly influenced the investment decisions of the class to its detriment.

Digital Equipment Corporation ["Digital"] moves for summary judgment, making an evidentiary showing that the disputed public statements were accurately based upon growth revenues and certified orders, and that disclosure of additional facts was unwarranted absent a duty to disclose pursuant to *Backman v. Polaroid Corp.*, 910 F.2d 10, 12–13 (1st Cir.1990). Capri counters that *Backman* does not apply where the plaintiff, unlike Backman, alleges misrepresentation rather than mere nondisclosure.[4]

## FACTUAL BACKGROUND

Upon a thorough review of the factual record developed with respect to this motion for summary judgment, the following facts are not genuinely disputed:

Between January 13, 1988 and March 18, 1988, members of the class purchased stock in Digital. During the months before the class period, Digital representatives made several public statements about the overall health and status of Digital in the wake of "Black Monday."[5] On October 14, 1987, Digital released its earnings for the first quarter of fiscal year 1988 ["1Q88"]. Digital Exhibit 1. The report showed a 24% gain in total operating revenues from 1Q87 and a 48% increase in net income for the same period. That day, Kenneth Olsen ["Olsen"], President of Digital, was quoted as saying "Overseas business remained firm, while orders from customers in the United States accelerated somewhat." Olsen based these remarks on growth revenues and certified order reports for 1Q88. Olsen aff. at ¶¶ 3, 4, 6.

Meanwhile, several internal meetings were held at Digital during which the Executive Committee discussed the state of the company and the economy in the wake of the stock market crash. At one such meeting, held on October 26, 1987, Olsen remarked upon possible adverse effects upon the company in the wake of the market falloff. Olsen encouraged the increased sale of products and services. Digital Interoffice Memo, Capri Exhibit 3. At another meeting, on October 30th, 1987, Digital

---

**2.** Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of use of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**3.** This Court certified the class as consisting of "persons who purchased Digital stock from January 13, 1988 through March 18, 1988 who allegedly were damaged by Digital's public statements concerning its financial and operating outlook during the third quarter of its fiscal 1988 year." *Capri Optics Profit Sharing v. Digital Equipment Corp.*, Memorandum and Order, April 20, 1989 at 1, 1989 WL 159602 (88–1295–Y).

**4.** Indeed, Capri alleges in its Complaint that "the defendants, in violation of the Exchange Act, made material misstatements and/or failed to disclose to shareholders, material adverse information which omissions were at the time and in light of the circumstances under which they were made, misleading." Complaint ¶ 41.

**5.** The stock market crash of 1987 began on "Black Monday," October 19, when the Dow Jones average dropped 508 points, prompting investor panic and anxiety among corporate executives across the country. Boston Globe, Oct. 23, 1987 at 68; *Id.*, Dec. 22 at 47.

executives discussed the market crash and its effect on the United States economy. Digital Interoffice Memo, Capri Exh. 4. Roughly three weeks later, at the November 5, 1987 Board of Directors meeting, the Executive Committee, in order to cope with the potential adverse financial impact of Black Monday, announced management strategies such as cost reduction programs, review of capital spending, and the like. Minutes at p. 5, Capri Exh. 5. A follow-up memorandum, dated November 6, 1987, allegedly from John J. Shields ["Shields"], Vice President at Digital,[6] remarked upon the uncertainties of domestic and international worldwide economic markets and expressed confidence in Digital's current business and future. Memorandum, Capri Exh. 6.

Meanwhile, Digital continued to examine the overall health of the economy and of Digital itself. An internal Operations Review, held on November 19, 1987, revealed that: "SSMI exceeded plan in Q1; the present forecast falls short of the plan in Q2; but makes the plan for the entire year." Digital Interoffice Memo at p. 4, Capri Exh. 8. The Review Chairman, Dick Fishburn, also explained why "CERTS are meeting plan, but revenue is falling short of plan." *Id.* The November 20, 1987 in-house meeting recognized a significant shortfall in the 2Q87 forecast and total-year forecast for the products businesses. *Id.* at p. 5. By December 14, 1987, Digital knew its costs were rising faster than revenue for the first time since 1985. Financial Forecast Reports, Capri Exh. 10, 11.

At a December 23, 1987 in-house meeting at Digital, the internal Operations Review revealed, "Although the year-to-date numbers look reasonable at this point, Q2 performance has weakened compared to Q1 ... there is a general concern that expectations are too high for the second half of FY 88." Digital Interoffice Memo at p. 2, Capri Ex. 13. Indeed, Charles E. Shue, Digital's Vice President of United States Sales, while testifying that in January 1988 he had not yet determined the impact of the crash on Digital's performance, admitted to taking some "precautionary steps on the expense side," believing that Digital would experience some effect from the market crash. Shue deposition at 60–61.

The next allegedly misleading statement occurred on January 13, 1988, when Mark Steinkrauss, Digital's Director of Investor Relations, was quoted in the *Wall Street Journal* as saying that "the company ... hasn't given out any negative guidance to analysts." Digital stock prices had fallen by $7.875 on January 12, 1988 and two financial analysts had reduced Digital's investment rating. Digital Exh. 13. Steinkrauss' statement was based upon his own conversations with the two analysts.[7]

On January 13, 1988, Digital issued a lengthy press release, revealing its 2Q88 figures, showing a 22% growth in revenues over 2Q87. Based on the figures and upon comparisons to IBM's revenue growth,[8] Olsen stated, "We are gratified that revenues continue to grow at a rate which indicates market share gains. Business overall is firm and our international business remains quite strong. Some of the industry sectors that performed particularly well in the quarter include ... financial services...." *Wall Street Journal*, Jan. 14, 1988 at p. 14, Digital Exh. 14. *See also* Olsen aff. ¶ 9, 10, 11. Olsen avers that his statements were made in good faith and were accurately based upon growth revenues and certified orders. Olsen aff. ¶ 17. *Compare Hahn v. Sargent*, 388 F.Supp. 445, 454 (D.Mass.), *aff'd* 523 F.2d 461 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) (affidavits denying existence of a conspiracy among defendants sufficient to defeat such a claim

---

**6.** The excerpt provided does not delineate the source of the memorandum.

**7.** Digital submitted the affidavits of the two analysts, Carol E. Muratore and J. Terence Carleton, affirming that each had not personally received any negative guidance from Steinkrauss. Muratore and Carleton affs.

**8.** In his affidavit, Mr. Olsen reveals that Digital's custom was to evaluate its performance in light of IBM's performance. Digital's market share depended "largely on how its revenue growth compare[d] to IBM's." Olsen Aff. at ¶ 8.

in absence of direct evidence of conspiratorial intent).

Mark Steinkrauss, in a conversation at the close of business on January 13, 1988, remarked: "Digital hasn't experienced order declines in the wake of the October stock market crash." The statement appeared in the *Wall Street Journal* the next day (January 14, 1988). Digital Exh. 14. Steinkrauss based this statement upon the growth in certified orders over 2Q87. Steinkrauss aff. at ¶ 8. He also relied upon a memo, dated January 12, 1988, from Robert C. Hughes ["Hughes Memo"] to Digital's Executive Committee, in which Hughes commented favorably upon Digital's post-crash performance.[9] In the same *Wall Street Journal* article, Steinkrauss remarked "[W]e're well poised to go into" the third quarter, though he did not predict third quarter performance. Digital's Exh. 14; Steinkrauss aff. at ¶ 11.

On the same day that Steinkrauss was speaking to the Wall Street Journal reporter, Digital's internal Certified Order Report stated "U.S.—Slow Start in Q3 FY88," referring to certs falling short of plan and revealing a negative growth in the international market.[10]

Capri asserts that the failure to disclose the corporate events of October 1987 through January 1988, rendered the nine statements misleading, in violation of Rule 10b–5 and § 10(b) of the Securities Exchange Act.

## SUMMARY JUDGMENT IN THE SECURITIES FRAUD CONTEXT

On a motion for summary judgment, this Court searches the evidence for a genuine issue of material fact. Fed.R.Civ.P. 56; *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1112 (9th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Where a dispute exists as to a material fact, summary judgment cannot issue. Capri, as non-movant, is entitled to every reasonable inference. Digital bears the burden of proving that no material issue of fact arises under these circumstances. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). The burden then shifts to Capri to show a material factual dispute. *Id.; Kennedy v. Chomerics, Inc.*, 669 F.Supp. 1157, 1160 (D.Mass.1987). Securities cases generally turn upon the resolution of factual allegations, thus precluding summary judgment. "However, summary judgment may be granted in appropriate cases." *In re Apple*, 886 F.2d at 1113, citing *Matsushita Electric Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987); *Ross v. Bank South, N.A.*, 837 F.2d 980, 1003 (11th Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990).

State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). But that does not mean that a party against whom summary judgment is sought is entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim. *Washington Post Co. v. Keough*, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966).

*Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir.1975).

## CONTROLLING AUTHORITY—*Backman v. Polaroid Corp.*

This case turns primarily on the extent of the application to the undisputed facts in this case of recent First Circuit authority, *Backman v. Polaroid Corp.*, 910 F.2d 10,

---

9. "Bottom line—the U.S. Field Cert Rate is up 30% over a year ago, with Financial Services being up 36% over a year ago. Bottom line—36% growth rate in U.S. is healthy." Hughes Memorandum, Digital Exh. 12.

10. *See* Certified Order Report, Capri Exh. 18. The certified order reports showed a slow start in United States orders until Week 7, where such orders made a strong showing. Capri Exh. 18.

12–13 (1st Cir.1990).[11] In *Backman*, the Court held that proof of a duty to disclose was essential to a nondisclosure claim under Rule 10b–5. There, certain investors claimed that Polaroid Corporation had failed to disclose to the public that its newest product, Polavision, had been unprofitable, instead touting the success of the product. The corporation, the investors asserted, knew that Polavision "was a commercial failure," triggering an independent duty to disclose particular facts about Polavision. *Id.* at 15. Backman never asserted that the statements were false, but claimed that they were fraudulent, absent additional information.[12]

The First Circuit rejected Backman's argument, ruling that there was no duty to disclose the additional information. The Court recognized that representations must be "complete and accurate," but held that the disclosure of additional facts is not necessary where the statement made "would not be so incomplete as to mislead." *Id.* at 16, quoting *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d at 862. The First Circuit reasoned that if Polaroid had knowledge of Polavision's inevitable ultimate failure, an incomplete representation about negative earnings would warrant a finding of material misrepresentation. *Backman*, 910 F.2d 10, 16. At the time of the statements challenged in *Backman*, however, Polaroid did not consider Polavision a complete failure and, therefore, did not have a duty to disclose any additional information. The absence of information about Polavision's below cost sale price and the less-than-impressive quantity of Polavision sales, did not, in *Backman*, make the statements incomplete or inaccurate as matter of law. *Id.*

## THE PRESENT CASE—MERE NONDISCLOSURE OR ACTIVE MISREPRESENTATION?

As noted above, Capri affirmatively alleges and argues that the conduct of Digital employees here amounts to active misrepresentation.[13]

Capri thus claims *Backman* is inapposite, citing *Save–On–Surplus Pension Plan v. United Saver's Bancorp, Inc.*, 760 F.Supp. 971 (D.N.H.1990) to support the proposition that *Backman* deals specifically with nondisclosure, not misrepresentation.[14] In *Save–On–Surplus*,[15] the plaintiff investors claimed that several opti-

---

**11.** *Backman* is a further explication of the prior decision of the First Circuit in *Roeder v. Alpha Industries*, 814 F.2d 22 (1st Cir.1987). There, the Court dismissed a fraud-on-the-market cause of action where, as matter of law, there was no duty to disclose additional information. Roeder asserted that news of a certain bribery was material to the purchase of shares of a defense contractor. The Court, determining that the information was indeed material, nonetheless held that Alpha had no affirmative duty to disclose it, only a responsibility to insure that the disclosures actually made were complete and accurate. *Id.* at 26, citing *Securities Exchange Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860–62 (2d Cir.), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756, *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971).

**12.** "In eight years of preparation and twelve days of trial, the words misrepresentation and misleading never crossed plaintiffs' lips, even when challenged by defendant's citation of *Roeder* [*v. Alpha Industries*, 814 F.2d 22 (1st Cir. 1987) ], except to deny that they were claimed." *Backman*, 910 F.2d at 14.

**13.** This case thus squarely presents the issue eschewed by the plaintiff in *Backman*, who did not change his tune to misrepresentation in the face of impending failure, but reiterated nondis-

closure, only to realize on appeal that only a claim of misrepresentation could prolong the life of his cause-of-action. *See Backman* at 14. ("Surely in the plaintiffs' four law firms, there must have been someone who read *Roeder* [814 F.2d 22 (1st Cir.1987) ] with dismay, and called attention to the escape route. The inference seems manifest that to shift to a claim of misrepresentation and misleading seemed even less hopeful than to stay where they were").

**14.** Neither Rule 10b–5 nor the Securities Exchange Act distinguishes between omissions and affirmative misrepresentations. Indeed, 15 U.S.C. § 78j(b) never mentions misrepresentation or omission, but enjoins the "use or employ[ment] ... of any manipulative or deceptive device," and Rule 10b–5 places both misrepresentations and omissions on equal footing. *See supra* n. 1, 2.

**15.** It ought be noted that *Save–On–Surplus* involved a motion to dismiss the complaint—a motion which Capri has already survived. The standard for resolution of a motion to dismiss is different from that presented upon consideration of a motion for summary judgment. In considering a motion for summary judgment, the court searches for a genuine issue of materi-

mistic statements in a shareholder's letter misrepresented a corporation's true financial condition,[16] in light of a loss in net income over 1Q88. *Id.* at p. 973. Chief Judge Devine refused to dismiss the action based on *Backman,* where the "[p]laintiff has done more than allege the failure to disclose material facts." *Id.* at 975. In *Save–On–Surplus,* however, the challenged representations went well beyond mere non-disclosure, particularly addressing the losses in net income and apparently attempting to explain them away.[17] Such an affirmative misrepresentation, Chief Judge Devine held, could not be treated as a nondisclosure under *Backman.* *Id.* at 975.

■ Unlike *Save–On–Surplus,* however, Capri here maintains only that the Digital statements were knowingly misleading by virtue of unrevealed additional information.[18] Nowhere does Capri question that the statements accurately reflected the internal growth revenues and certified orders themselves.[19] Rather, Capri here relies upon the absence of additional information to support its claim. Under these circumstances, this is nothing more than a nondisclosure claim and the *Backman* decision controls. A claim of nondisclosure cannot be camouflaged as a case of misrepresentation to avoid an applicable rule of law.

## THE DUTY TO DISCLOSE

■ Under *Backman,* Capri must show that Digital had an independent duty to

disclose those additional corporate events of October, November, and December, 1987, and January, 1988. Generally, a duty arises only to reveal those facts "that are needed so that what was revealed would not be 'so incomplete as to mislead,' " *Backman,* 910 F.2d at 16. A statement is misleading if it presents a false report of the facts. *Jaroslawicz v. Englehard Corp.,* 704 F.Supp. 1296, 1306 (D.N.J.1989). If the truth of a statement can be readily verified from information publicly available, the statement is not actionable under the securities laws. *See Basic Inc. v. Levinson,* 485 U.S. 224, 248–49, 108 S.Ct. 978, 992–93, 99 L.Ed.2d 194 (1988).

■ An examination of the nature of the statements and the additional information reveals the weakness of Capri's argument. The reports about Digital in October 1987 showed a 35 percent growth in revenues. Olsen relied upon these numbers when making his statements of October 14, 1987. The January 13, 1988 press releases and reports revealed a 22 percent growth in revenues. Olsen again based his statements of January 14, 1988 on this reported revenue growth. Analyst Hughes reported on January 13, 1988 that Digital had a 36 percent growth rate in certified orders, upon which Steinkrauss relied in making his January 14, 1987 statement about order declines. That Steinkrauss' statement re-

---

al fact, while on a Rule 12(b)(6) motion, the court may dismiss only if the plaintiff cannot prove its case on any set of possible facts within the ambit of the claims made in the complaint. *Id.* at 973–974, citing *Lessler v. Little,* 857 F.2d 866, 867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989).

16. The letter discussed the future of the corporation and concluded that the "Corporation is well positioned for the future." *Save–On–Surplus,* at p. 973.

17. In particular, the corporation issued a statement explaining the income loss as follows: "The increase in the first quarter 1989 loan loss provision can be attributed to the Company's proactive approach in positioning the Company into the future." *Save–On–Surplus* at 973.

18. The Digital representatives, of course, maintain that the statements regarding financial mat-

ters were accurately based upon growth revenues and certified orders. *See* Steinkrauss and Olsen affidavits.

19. Capri does not deny that the statements were accurately based on the growth revenues and certified orders. This much is undisputed. Nor is it disputed that certified orders may properly be used as a predictor or marker for investment. Instead, Capri denounces the accuracy of the growth revenues and certified orders themselves. Even if Capri has succeeded in identifying genuine issues of fact concerning the accuracy of the growth revenues and certified orders, however, such issues are not here material, as there is no adequate showing by Capri that the authors of the challenged statements were actually aware of the factual issues concerning these matters or acted in reckless disregard of the facts in making the statements.

garding negative guidance was based solely on his personal interaction with two financial analysts is corroborated by the affidavits of Carol Muratore and J. Terence Carleton. Again, Capri never denies that the statements were accurately based on growth revenues and certified orders.

▉ The information allegedly not disclosed was bruited about at the October 26th, 30th, and November 5th meetings at Digital. The evidence shows that these meetings dealt mostly with the state of the economy and its potential adverse effect upon Digital. Surely, every company remotely related to the financial services sector was similarly introspective at this time in 1988. Were the law to require disclosure of all introspection, an affirmative duty to disclose ALL information would arise. The First Circuit has already established that the law does not require a company affirmatively to disclose ALL information. See Roeder, 814 F.2d at 26–27. What is required is disclosure of information sufficient to make the challenged statements complete and accurate.

Even the non-disclosed certified order report of January 13, 1988 cannot support a finding of a duty to disclose. The certified order report showed a "slow start" as measured against the corporate plan. A report about orders measured against expectations does not render the January 13, 1988 press release or Olsen's statement about past performance misleading. In fact, Olsen and Steinkrauss have adequately supported the bases for their statements, without refute from Capri.

Upon the undisputed facts before it, therefore, this Court rules that Digital was under no duty to make additional disclosures.[20]

## CONCLUSION

Consequently, as the undisputed evidence before this Court cannot support a finding that the challenged statements were incomplete and inaccurate absent disclosure of the internal corporate events between October, 1987, and January, 1988, Digital's motion for summary judgment is, based upon the decision in *Backman v. Polaroid Corp.*, hereby GRANTED.[21]

**20.** This Court questions whether the information allegedly not disclosed was even material, *i.e.,* information affecting a reasonable investor's decision to invest. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). No evidence is presented that Capri would have refrained from investing had those things been done which Capri says ought have been done. Having ruled that there was no duty to disclose, this Court need not rule upon the materiality of the non-disclosures.

**21.** This Court recently dismissed an unrelated fraud-on-the-market securities case with the observation that, if the case were properly managed, the costs of arriving at a prompt and proper summary judgment resolution ought be but marginally greater (and certainly more just) than dismissal pursuant to Fed.R.Civ.P. 9(b). *Boyle v. Merrimack,* 756 F.Supp. 55, 59 n. 9 (D.Mass.1991).

The present case demonstrates that this Court's observation in *Boyle* concerning comparative litigation costs is certainly overly sanguine and may be seriously flawed. This case was filed on June 3, 1988. Approximately seven months later, this Court dismissed the case as to the fourteen individual defendants but denied Digital's motion to dismiss pursuant to Fed.R. Civ.P. 9(b). Discovery proceeded. The plaintiff class was certified on April 20, 1989. Digital filed this motion for summary judgment on December 1, 1989 and late that month moved to stay discovery. This Court allowed that motion early in January, 1990, and heard the motion for summary judgment on January 18, 1990. Pursuant to Fed.R.Civ.P. 56(f), Capri was given 90 additional days to conduct certain designated discovery. Even so, the motion for summary judgment was not re-heard until October 16, 1990. This opinion and order now—March, 1991—resolves the motion and the case on the ground that Capri cannot prove the allegations of fraud it made nearly three years ago. What of this result? While the result is just—and the supporting record is now certainly more extensive—the litigation cost to all parties of reaching this point is greater by far than it would have been had the Court simply dismissed the action in January, 1989. Dismissal, however, would have been error. Even so, in retrospect this Court ought have required an earlier filing of the motion for summary judgment and directed completion of discovery by that date. Only by such aggressive judicial control could the litigation costs here have been limited.